# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellant,*

  v.

GONZALEZ, INC. dba GOLDEN STATE
TRANSPORTATION,
  *Defendant-Appellee.*

No. 04-10041

D.C. No.
CR-01-01696-RCC

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
PANEL
REHEARING AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, District Judge, Presiding

Argued and Submitted
December 7, 2004—San Francisco, California

Filed June 22, 2005
Amended February 10, 2006

Before: Dorothy W. Nelson, Andrew J. Kleinfeld, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge D.W. Nelson

**COUNSEL**

Bruce M. Ferg, (argued); Paul K. Charlton and Christina M. Cabanillas (on the briefs), Office of the U.S. Attorney, Tucson, Arizona, for the plaintiff-appellant.

William Kirchner (argued) and Walter Nash (on the briefs), Nash & Kirchner, P.C., Tucson, Arizona; Jefferson Keenan (on the briefs) and Michael Piccarreta (argued), Piccarreta & Davis, P.C., Tucson, for the defendants-appellees.

**ORDER**

The Appellant's petition for panel rehearing is granted in part and the opinion filed on June 22, 2005, slip opinion at 7425 and published at 412 F.3d 1102 (9th Cir. 2005), is amended as follows:

> Page 7448 of the slip opinion, line 12: Replace "In such an office, individuals who own and manage the business operation have a reasonable expectation of privacy over the on-site business conversations between their agents." with "In such an office, indi-

viduals who own and manage the business operation have a reasonable expectation of privacy over conversations taking place on the office's telephone lines."

Page 7448 of the slip opinion, line 23: replace "they had a reasonable expectation of privacy over calls made on the premises." with "they had a reasonable expectation of privacy over calls made from, to, and within the premises."

With these amendments, the petition for panel rehearing is otherwise denied. No further petitions for rehearing or rehearing en banc may be filed.

## OPINION

D.W. NELSON, Circuit Judge:

The government appeals the district court order granting in part defendants' motion to suppress evidence obtained as a result of wiretaps at the Los Angeles headquarters of Gonzalez, Inc., dba Golden State Transportation (GST). We consider below whether the district court erred by: (1) conducting a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978); (2) finding that the wiretap issued for the company headquarters failed to meet the statutory necessity requirement; and (3) granting standing to Antonio and Francisco Gonzalez to challenge all conversations intercepted under the invalidated wiretap order. We conclude that each of the district court's rulings was correct, and thus we affirm.

### *FACTUAL AND PROCEDURAL BACKGROUND*

This appeal involves a multi-year investigation into an alleged conspiracy to smuggle aliens into the United States

using a public bus company, GST. Although the government received and acted upon reports of alien smuggling at GST as early as May 1996, a sustained federal investigation into the alleged smuggling ring facilitated by GST did not begin until 1999. At that time, GST had bus terminals in nine western states.

Initially, the investigation focused on GST's Arizona operations. During this stage, federal agents employed several traditional investigative methods. For example, agents used pole cameras to conduct about 25,000 hours of video surveillance at the Tucson and Phoenix bus terminals and at a Tucson motel believed to be an alien safe house. In addition, agents in parked cars conducted 2,000 hours of physical surveillance near the two terminals. Undercover agents were widely used to gain an understanding of what occurred inside the terminals and on the buses. Two undercover agents became GST bus drivers, and one of these agents later worked at the Tucson terminal selling bus tickets and handling baggage. Undercover agents also posed as both undocumented aliens on GST buses and as smugglers at GST terminals. Other undercover agents infiltrated an alien-smuggling organization by picking up aliens near the border and taking them to the Tucson terminal. As a result of these successful efforts, agents engaged in, and even recorded, many conversations implicating GST employees in alien-smuggling activities. The government also recruited confidential informants (CIs) from GST's past and current employees, including a current dispatcher at the Tucson terminal and a bus driver. These CIs provided company documents and valuable information to aid the government investigation. Finally, the government also utilized pen registers and trap-and-trace devices to gather information in the Arizona-centered investigation.

After this intensive investigation into the activities at the Phoenix and Tucson terminals, the government applied for a wiretap order of these terminals' telephones (hereafter "Terminal wiretap"). On April 2, 2001, the district court issued an

order authorizing the Terminal wiretaps. After this authorization, the government conducted immigration stops of approximately thirteen GST buses departing from the terminals to generate chatter among the suspected conspirators. The government intercepted a phone call made by Francisco Gonzalez, the founder and vice president of GST, from the company's headquarters on Blake Avenue in Los Angeles. During this call Francisco discussed the immigration stops of GST buses from the Tucson and Phoenix terminals. On May 4, 2001, the government applied for, and was granted, a 30-day extension of the Terminal wiretap. During this extension the government intercepted an additional telephone conversation between Francisco and a Phoenix terminal employee where Francisco inquired if the terminal had "been bothered anymore," presumably by immigration.

On May 30, 2001, the government applied for a wiretap of GST's Blake Avenue office in Los Angeles, which the district court granted (hereafter "Blake Avenue wiretap"). Special Agent Richard Hill of the U.S. Border Patrol, supplied an affidavit in support of this application. A key purpose of the Blake Avenue wiretap was to intercept incriminating evidence linking Francisco, his son Antonio Gonzalez, and others in the Blake Avenue office to the alleged alien-smuggling ring. At the time, Antonio was the president and chief operating officer of GST. According to Hill's affidavit, prior to the Blake Avenue wiretap, the government had intercepted only two telephone calls from Antonio, which merely "indicate[d] that Antonio was aware of law enforcement action in which undocumented aliens were removed from [GST] buses and that he conversed with his father [(Francisco)], brother and managers regarding the corporate activities." In contrast, the government had intercepted "[s]everal calls" from Francisco during which he "discussed the movement of people on his buses and routinely asked about intervention from immigration and local law enforcement."

On either July 13 or 14, 2000, long before the government requested *any* wiretaps as part of this investigation, one of the

government's CIs, a GST bus driver, visited the Blake Avenue office unannounced and engaged Francisco in conversation while wearing a wire. During the conversation, the informant questioned Francisco about a recent company memorandum requiring drivers to check for undocumented aliens on their buses. Francisco insinuated that the memorandum did not refer to the prearranged smuggling of undocumented aliens from Tucson, but rather to unauthorized aliens who may sneak onto GST buses coming over the border. The same CI returned, at the government's request, to the Blake Avenue office to speak with Francisco again that same day. This time the CI more directly questioned Francisco about the smuggling of aliens using GST buses. Neither of these recorded conversations was reported in any of the government's affidavits supporting any of its wiretap requests.

As acknowledged in the Hill affidavit, the government conducted limited investigation into activities at the Blake Avenue office before seeking the Blake Avenue office wiretap. This brief investigation included: five-days of pen registers on the office's telephones; an equally brief use of trap-and-trace analysis of the telephones; limited physical surveillance; and a preliminary inquiry attempting to place an undercover agent at one of the company's "Los Angeles offices," which might have included the Blake Avenue office.

Agent Hill's affidavit for the Blake Avenue wiretap stated that "[p]hysical [s]urveillance has been attempted at the headquarters but was not successful" because the building's layout and proximity to a residential neighborhood precluded agents from gathering this evidence. The affidavit also deemed further physical surveillance impractical based on "what may have been a counter-surveillance effort" in which agents were once briefly followed by a vehicle after leaving the surveillance site.

Despite the success of video surveillance earlier in this investigation, the Blake Avenue affidavit stated that a pole

camera or other video surveillance of the office was not attempted because any effort would fail to "reveal the corporate transactions relating to illegal activities occurring inside" the building.

Agent Hill also claimed in his affidavit that "[u]ndercover agents have been used extensively throughout this investigation," but goes on to make clear that none of these agents infiltrated the Blake Avenue building. Despite the fruitful evidence produced by undercover agents in the terminal investigation, Agent Hill averred that prior to the Blake Avenue wiretap application only a lone attempt was made to infiltrate "one of [GST's] Los Angeles offices." The affidavit does not indicate whether this infiltration attempt was focused, like the earlier efforts, on a terminal in the Los Angeles area or on the Blake Avenue office itself. On the face of the affidavit, the repeated description of this infiltration attempt as being targeted to "one of the Los Angeles offices" as opposed to "the Los Angeles office" or even the "Blake Avenue office" makes it impossible for an issuing court to have concluded that this infiltration attempt was focused on the Blake Avenue office.[1]

Based on the record created in the *Franks* hearing, we do know that one undercover agent was able to speak with Francisco, but could not engage him in a discussion of illegal activity. According to the affidavit, undercover agents had less success speaking to Antonio and had only been able to engage in "minimal contact such as greetings" with him.

To justify the lack of attempts to infiltrate higher-level jobs within GST, including those at the Blake Avenue office, Hill's affidavit stated that GST immediately filled every high-level job with people "closely connected to the Gonzalez fam-

---

[1]The appellees made a motion before this court to supplement the record with evidence that this infiltration was decidedly aimed at a Los Angeles bus terminal, and not at the Blake Avenue office. This motion was denied.

ily." The evidence produced in the *Franks* hearing, however, indicated that only one of the 25 people with offices at Blake Avenue was a member of the Gonzalez family and at least some high-ranking officials were hired after responding to newspaper advertisements, suggesting that undercover work could be fruitful.

The affidavit in support of the Blake Avenue wiretap also stated that "several current and ex-employees of [GST] ranging from dispatchers to managers have been interviewed" and "provided valuable historical information" about GST. None of these CIs, however, was identified as having worked at the Blake Avenue office. Furthermore, the affidavit makes no claim that federal agents ever tried to recruit CIs from the Blake Avenue office before seeking the wiretap.

Finally, Agent Hill's affidavit dismissed as impractical a handful of investigative techniques that had not been tried before the Blake Avenue wiretap was sought. The affidavit stated that trash runs were not utilized because the office trash bin was inside a fence. Although Agent Hill's affidavit stated that "many of [GST's] records may be held in [GST's] headquarters," the affidavit rejected the use of a search warrant at the Blake Avenue office because such a search might "not result in the discovery of sufficient evidence to show the responsibility of Corporate officers and employees such as Francisco and Antonio Gonzales." At either location, the affidavit stated that use of search warrants or grand jury subpoenas would reveal the investigation to the targets. The affidavit also rejected the use of grand jury subpoenas on the belief that conspirators would likely avail themselves of their Fifth Amendment privilege against self-incrimination. On June 16, 2001, the Blake Avenue wiretap was terminated.

Both Antonio and Francisco Gonzalez worked in the GST headquarters on Blake Avenue and Antonio had an office in the building. Antonio and Francisco jointly owned the Blake Avenue building, but had leased the building to Gonzalez,

Inc., dba GST, for a four-year term, which ended on May 31, 2001. The lease allowed a month-to-month continuance after the four-year term ended. On July 31, 2002, Antonio and Francisco terminated the lease.

On August 15, 2003, Gonzalez, Inc. along with 10 individual defendants, including Antonio and Francisco, filed a joint motion to suppress all evidence resulting from the Terminal wiretap, its extension, and the Blake Avenue wiretap. Defendants alleged that the wiretap applications contained material misrepresentations and omissions and, therefore, violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510-2522. The defendants requested, and were granted, a *Franks* hearing to determine whether the affidavits submitted in support of the wiretap applications contained intentional or reckless misstatements or omissions of material fact regarding the necessity for the wiretaps.

On November 25, 2003, the district court granted in part and denied in part the defendants' motion to suppress the wiretap evidence. The court found that the Terminal wiretap and its 30-day extension were authorized, but concluded that the government had not met its burden of proving necessity for the Blake Avenue wiretap, and therefore, that any evidence from that wiretap must be suppressed. The district court did not explicitly find that there were any material misstatements or omissions in any of the wiretap affidavits that negated the necessity for the wiretap orders.

On December 19, 2003, the district court found that Antonio and Francisco Gonzalez had standing to challenge all intercepted communications from the Blake Avenue wiretap. The government timely appeals the suppression of evidence from the Blake Avenue wiretap and the granting of standing to Antonio and Francisco to challenge all intercepted calls under the Blake Avenue wiretap.

*DISCUSSION*

**[1]** When Congress enacted the wiretapping provisions of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-2522, it intended to "make doubly sure that the statutory authority [for wiretaps] be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications." *United States v. Giordano*, 416 U.S. 505, 515 (1974). Narrow construction of the wiretapping provisions furthers Congress' dual purposes for the act of " '(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized.' " *Gelbard v. United States*, 408 U.S. 41, 48 (1972) (quoting S. Rep. No. 90-1097, at 66 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2122, 2153).

**[2]** To enforce the privacy-centered purposes of these provisions, Congress created important statutory prerequisites for obtaining wiretap orders, including the requirement that the government must prove necessity before it may utilize the unconventional method of wiretaps as an investigative tool. Congress also granted standing for any aggrieved person to move to suppress any evidence from a wiretap unlawfully employed. Finally, the Supreme Court, in *Franks*, created a route to invalidate wiretap orders if the affidavits supporting them conceal or misrepresent material facts leading a judge inappropriately to find necessity for a wiretap order. 438 U.S. 154.

While the district court below did not find material misrepresentations or omissions in the preparation of the affidavit, it concluded that the evidence presented within the four corners of the affidavit failed to establish the necessity for the Blake Avenue wiretap. Accordingly, the district court ordered that the evidence produced from this wiretap must be suppressed.

### *I. The Defendants Made the Requisite Showing to Warrant a* **Franks** *Hearing*

The government argues that the district court erred in granting a hearing pursuant to *Franks* to determine whether the applications for the Terminal and Blake Avenue wiretaps contained material misrepresentations or omissions. We disagree. This court reviews de novo a district court's decision to grant a *Franks* hearing, but reviews the court's factual determination concerning misleading statements and omissions after such a hearing under the clearly erroneous standard. *United States v. Shryock*, 342 F.3d 948, 975 (9th Cir. 2003), *cert. denied*, 541 U.S. 965 (2004); *United States v. Tham*, 960 F.2d 1391, 1395 (9th Cir. 1992); *United States v. Ippolito*, 774 F.2d 1482, 1484 (9th Cir. 1985).

To obtain a *Franks* hearing, defendants must make a preliminary showing that the wiretap applications contained material misrepresentations or omissions. *Shryock*, 342 F.3d at 977; *United States v. Bennett*, 219 F.3d 1117, 1124 (9th Cir. 2000). The defense filed 100 pages of attachments to support its claims of misrepresentations and omissions in the wiretap affidavits. These documents made a sufficient offer of proof to support defendants' claims that the affidavits (1) misrepresented the limited use of pole cameras in this investigation; (2) misrepresented that further physical surveillance was highly likely to be compromised; (3) inaccurately portrayed the government's CIs as having less access to GST's key officers than they actually possessed; and (4) misrepresented the ability of the government to place an undercover agent in the Blake Avenue office.

**[3]** The district court correctly determined that the defense adequately pled that the misrepresentations and omissions were made with the requisite state of mind. Our case law does not require clear proof of deliberate or reckless omissions or misrepresentations at the pleading stage. *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985). Instead, at this stage

we simply require the defense to make a substantial showing that supports a finding of intent or recklessness. *Id*. Given the affiant's key role in the investigation, we can conclude that he knew or should have known the veracity of the challenged statements in his affidavit because these statements all concerned the potential of traditional investigative techniques to gather information on the role any individuals at the Blake Avenue office played in the alleged conspiracy.

**[4]** The defendants also adequately pled materiality. Each of the alleged misrepresentations and omissions related to the ability of customary investigative tools to produce the evidence sought by the government in its investigation into the Blake Avenue office. Therefore, any finding of a material misrepresentation or omission would undermine the government's ability to prove the need for the Blake Avenue wiretap. Because the defendants made an adequate initial showing of intentional or reckless material misrepresentations or omissions in the wiretap application, the district court did not err in holding a *Franks* hearing. It is of no matter that the district court ultimately decided, after an evidentiary hearing, that no *Franks* violation occurred. This is, after all, the purpose of a hearing.

On appeal, the defendants urge us to conclude that the district court implicitly found a *Franks* violation with respect to the Blake Avenue wiretap application. According to the defendants, because the district court ultimately concluded that the affidavit in support of the Blake Avenue wiretap failed to establish necessity, the court implicitly found that the affidavit contained material misrepresentations or omissions in violation of *Franks*. The defendants speculate that the district court did not make this finding explicit out of a desire not to malign the agent who wrote the affidavit. Although this is a possible interpretation of the district court order, we are not in the business of putting words in the mouth of the district court to uncover a district court's phantom finding. Therefore, we will not graft an implicit finding of a *Franks* violation

onto the district court's order. As an appellate court, our duty to evaluate all supportable bases for affirming a district court finding is triggered only when the finding itself has been explicitly made.

## II. *Necessity for the Blake Avenue Wiretap was not Established*

The government urges us to reverse the district court's determination that the application in support of the Blake Avenue wiretap failed to establish necessity. We review de novo whether a full and complete statement of the facts supporting a wiretap application was submitted in compliance with 18 U.S.C. § 2518(1)(c). *United States v. Canales Gomez*, 358 F.3d 1221, 1224 (9th Cir. 2004); *United States v. McGuire*, 307 F.3d 1192, 1197 (9th Cir. 2002). Such review includes an assessment of whether the affidavit attests that adequate investigative tactics were exhausted before the wiretap order was sought or that such methods reasonably appeared unlikely to succeed or too dangerous. *United States v. Lynch*, 367 F.3d 1148, 1159 (9th Cir. 2004). However, we review the issuing court's ultimate decision to authorize a wiretap for an abuse of discretion. *Canales Gomez*, 358 F.3d at 1225; *McGuire*, 307 F.3d at 1197.

In support of its argument regarding the district court's necessity finding, the government points to portions of the district court's order indicating that the court may have considered evidence produced in the *Franks* hearing to reach its necessity conclusion. Only the evidence presented within the four corners of the wiretap application can be used to evaluate necessity. 18 U.S.C. § 2518(3)(c). We hold that based solely on the statements in the affidavit, it was error for the issuing judge to conclude that the government had met its burden of establishing necessity for the Blake Avenue wiretap and thus affirm the district court's decision.

**[5]** To obtain a wiretap, the government must overcome the statutory presumption against this intrusive investigative

method by proving necessity. *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001); *Ippolito*, 774 F.2d at 1486 (citing *Giordano*, 416 U.S. at 515; *United States v. Bailey*, 607 F.2d 237, 241 n.11 (9th Cir. 1979)). Together, 18 U.S.C. § 2518(1)(c) and (3)(c) comprise the necessity requirement for wiretap orders. According to 18 U.S.C. § 2518(1)(c), the government may establish necessity for a wiretap by any of three, alternative methods. The government may show that traditional investigative procedures (1) have been tried and failed; (2) reasonably appear unlikely to succeed if tried; or (3) are too dangerous to try. *See also United States v. Smith*, 31 F.3d 1294, 1298 n.2 (4th Cir. 1994).

This circuit has interpreted these necessity provisions to require a "full and complete statement of specific allegations" establishing the necessity of the wiretap sought. *Blackmon*, 273 F.3d at 1207 (citing *Ippolito*, 774 F.2d at 1486). When reviewing necessity we employ a "common sense approach" to evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use. *Blackmon*, 273 F.3d at 1207; *United States v. Commito*, 918 F.2d 95, 98 (9th Cir. 1990).

### A. Normal investigative procedures had not been adequately utilized

The district court below concluded that the government did not appropriately utilize traditional investigative methods before requesting the Blake Avenue wiretap. The district court found that before the order was sought "[n]o independent verification of any significance was really done to indicate why the wiretaps at the Blake Office were necessary." We agree. Read in the most generous light, the Hill affidavit submitted in support of the Blake Avenue wiretap contended that only the following investigative methods targeted at the Blake Avenue office were tried before a wiretap was sought:

(1) five-days-worth of pen register analysis; (2) an equally short use of trap-and-trace analysis; and (3) limited physical surveillance of the Blake Avenue office. As discussed below, this limited use of traditional methods does not establish that normal tools were sufficiently exhausted before the government requested a wiretap.

First, the affidavit revealed that for five days the government used pen registers, which recorded calls dialed from the target telephones at the Blake Avenue office, and trap-and-trace devices, which recorded the incoming calls to these telephones. As these devices simply record numbers dialed or received, they are inherently unlikely to reveal the kind of information the government was seeking on the scope of the conspiracy. We have held that the use of pen registers alone is insufficient to establish necessity for a wiretap. *Carneiro*, 861 F.2d at 1183 n.16. In addition, this court has also refused to condone a wiretap order when the supporting application only established that law enforcement pursued traditional investigative methods that were unlikely to produce pertinent evidence before seeking the wiretap. *Id.* at 1183.

Second, the Hill affidavit indicated that limited physical surveillance of the Blake Avenue office was tried, but abandoned because agents "were unable to detect any activities consistent with the evidence previously gathered in the investigation because of the layout of the building and its location near a residential neighborhood." The affidavit also stated that agents were once "followed by a vehicle in what may have been a counter surveillance effort." In *Blackmon*, this court rejected the notion that a single incident of failed physical surveillance could establish that any subsequent surveillance could be ruled out as likely to be unsuccessful or too dangerous to pursue. 273 F.3d at 1209.

Third, Agent Hill averred that prior to the Blake Avenue wiretap application one attempt was made to infiltrate "one of [GST's] Los Angeles offices," but the affidavit does not indi-

cate whether this infiltration attempt was focused, like every other infiltration discussed, on a bus terminal or if the attempt was targeted at the Blake Avenue office itself. The description of this attempt in the affidavit, as being targeted to "one of the Los Angeles offices" as opposed to "the Los Angeles office" or even the "Blake Avenue office" made it impossible for the issuing judge to conclude that this infiltration attempt was focused on the Blake Avenue office.

In its affidavit, the government also argues that the limited information produced by the Terminal wiretap linking Antonio and Francisco to the alleged conspiracy justify the Blake Avenue wiretap. The fact that traditional investigatory tactics directed at GST's Arizona activities — or even the extraordinary measure of wiretapping phones in Arizona bus terminals — did not produce sufficient evidence linking GST employees working out of the Los Angeles office on Blake Avenue to the alleged conspiracy is hardly surprising. Nor is such a claim adequate evidence that traditional investigative tools were exhausted with respect to the newer, Los Angeles-targeted stage of the investigation. Only the failure of "normal," not extraordinary, investigative measures justifies the statutory necessity requirement.

**[6]** Even when all of the traditional investigative techniques reportedly used in conjunction with the investigation into the Blake Avenue office are viewed together, it is clear that the steps taken before the Blake wiretap was sought fall short of what our case law requires. *Cf. Carneiro*, 861 F.2d at 1178 (upholding wiretap order where the DEA used CIs, surveillance, pen registers, and undercover agents before resorting to a wiretap). In reaching our holding, we are cognizant that the necessity requirement should not be interpreted to require law enforcement to exhaust every possible technique before resorting to wiretapping, but to ensure that in the usual case wiretapping is not used as the first meaningful step in an investigation. *Carneiro*, 861 F.2d at 1181; *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986); *United States v.*

*Martin*, 599 F.2d 880, 887 (9th Cir. 1979); *see also Ippolito*, 774 F.2d at 1486. In our judgment, the facts attested to in the Hill affidavit indicate that the government side-stepped its responsibility to use promising traditional techniques when it began to investigate the Blake Avenue office, and instead conducted only the most cursory investigation before seeking a wiretap. We hold that the necessity provisions require the government to do more.

###### B.    Unutilized investigative procedures were reasonably likely to succeed

**[7]** Even though the government failed to show that it had used an ample array of traditional investigative tools before seeking the Blake Avenue wiretap, the government would have proven necessity had it reasonably attested that the unused tools were unlikely to succeed. *Ippolito*, 774 F.2d at 1486. The government has made no such showing. On the contrary, the wiretap application itself showed that law enforcement did not first attempt, without success, traditional investigative methods that may have been "potentially productive." *Id.*

First, although the affidavit claimed that neither physical nor video surveillance was likely to produce useful information as the Blake Avenue "headquarters are housed in a building that has large darkened windows that do not allow either physical or video visual surveillance of the activities inside," we cannot accept this as evidence that such surveillance was reasonably unlikely to bear fruit. Surely surveillance is not completely unsuccessful if it does not decipher what an individual is writing while she sits at her desk. Accepting the limitations of the location of the office as noted in the affidavit, it is still reasonable to conclude that video or physical surveillance could have identified individuals, such as known *coyotes* (those who assist in the illegal entry of persons for a fee), coming and going from the Blake Avenue office. This information certainly would have assisted law enforcement in dis-

covering the identities of "members of the criminal enterprise and aiders and abettors," a stated purpose of the Blake Avenue wiretap.

Second, the facts presented in the Blake Avenue affidavit suggest that the use of confidential informants or undercover agents in relation to the Blake Avenue was a potentially productive, but unutilized tool. These methods not only have the potential to provide highly detailed information on those working at the Blake office, but also as the affidavit itself indicated, these tools had already proven effective in earlier stages of the investigation. The Hill affidavit discusses the useful information obtained from CIs during the earlier stages of the investigation targeted at the bus terminals, but the affidavit makes no claims that CIs were ever recruited from the Blake Avenue office. This information should have led the issuing judge to question why the government did not attempt to use CIs to investigate the Blake Avenue office.

Third, the affidavit's terse rejection of the possible productive use of grand jury subpoenas or search warrants does not establish that these investigative techniques were reasonably unlikely to work. The affidavit rejects these tools by claiming they would likely reveal the investigation to its targets. Such statements do not reasonably explain why traditional investigative tools are unlikely to succeed in a particular investigation, but are "boilerplate conclusions that merely describe inherent limitations of normal investigative procedures," which we have found insufficient to establish necessity. *Blackmon*, 273 F.3d at 1210; *see also id.* at 1211 (The fact "that traditional investigation methods do not reveal all are generic problems of police investigation. Their generic nature does not dissipate simply because the government claims a vast investigative purpose. . . . The government may not cast its investigative net so far and so wide as to manufacture necessity in all circumstances.")

[8] To cover its failure to establish necessity for the Blake Avenue wiretap, the Hill affidavit attempted to shoe-horn the

significant investigatory work the government conducted before applying for the Terminal wiretap into its application for the Blake Avenue wiretap. But the government is not free to transfer a statutory showing of necessity from one application to another — even within the same investigation. This court has held that an issuing judge may not examine various wiretap applications together when deciding whether a new application meets the statutory necessity requirement. Each wiretap application must separately satisfy the necessity requirement. *See Carneiro*, 861 F.2d at 1180-81 (upholding an initial wiretap order, but invalidating subsequent orders covering other suspects because the later applications did not show that particularized investigative actions were targeted, without success, at each later suspect); *see also Brone*, 792 F.2d at 1507. Accordingly, we hold that the Blake Avenue wiretap application did not establish that adequate traditional tools were tried before the wiretap was sought or that these untried alternatives were reasonably unlikely to be productive.

### C. Unused investigative procedures were not too dangerous to be tried

**[9]** The affidavit in support of the Blake Avenue wiretap makes no claim that normal investigative procedures were reasonably determined to be too dangerous to try. Quite sensibly, the necessity requirement for a wiretap order does not compel law enforcement officers to use traditional investigative strategies at the risk of danger to themselves or others. *See McGuire*, 307 F.3d at 1197 (upholding a wiretap order without requiring exhaustion of traditional investigative tools due to the "grave dangers" involved with any such effort because of the target "group's known violent propensity and undisputed possession of assault weapons"). The Blake Avenue affidavit contained no statements supporting a finding that law enforcement had any reason to fear danger from anyone associated with the office.

**[10]** A district court's decision to grant a motion to suppress wiretap evidence is reviewed de novo. *United States v.*

*Reyna*, 218 F.3d 1108, 1110 (9th Cir. 2000). But the court's underlying factual findings are reviewed under the clearly erroneous standard. *United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004). The court below correctly determined that the affidavit in support of the Blake Avenue wiretaps failed to meet the statutory necessity requirements. Based solely on the evidence presented in the affidavit, it was evident that the government made limited use of traditional, and potentially productive, investigative methods before seeking the Blake Avenue wiretap. The affidavit did not allege sufficiently that these strategies were reasonably unlikely to succeed or too dangerous to try. Therefore, the issuing court abused its discretion in concluding that the government established necessity for the Blake Avenue wiretap. Because this wiretap did not meet the statutory necessity requirements, the evidence obtained from it is "fruit of the poisonous tree," and must be suppressed. 18 U.S.C. § 2515 (codifying the fruit of the poisonous tree doctrine for wiretapping evidence).

### III. *Antonio and Francisco have Standing to Challenge the Conversations Intercepted under the Blake Avenue Wiretap*

The government also appeals the district court's order granting Antonio and Francisco Gonzalez standing to challenge the contents of all conversations intercepted by the Blake Avenue wiretap, not simply those conversations in which they participated. The question of whether a particular defendant has standing to challenge the legality of a search is a mixed question of law and fact. We review the district court's ultimate legal conclusion on standing de novo, and the findings of fact related to this conclusion for clear error. *United States v. Sarkisian*, 197 F.3d 966, 986 (9th Cir. 1999).

[11] For the purposes of challenging wiretaps, the relevant statute provides that

> Any aggrieved person in any trial . . . before any court . . . of the United States . . . may move to sup-

press the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that . . . the order of authorization or approval under which it was intercepted is insufficient on its face.

18 U.S.C. § 2518(10)(a). The statute defines an aggrieved person as one "who was a party to any intercepted wire, oral, or electronic communication or a *person against whom the interception was directed*." 18 U.S.C. § 2510(11) (emphasis added). The Supreme Court has interpreted these provisions as limiting standing to challenge wiretaps to persons whose Fourth Amendment rights were violated by the interception. *Alderman v. United States*, 394 U.S. 165, 175-76, n.9 (1969); *see also United States v. King*, 478 F.2d 494, 506 (9th Cir. 1973). The touchstone for Fourth Amendment standing analysis is whether the individual asserting her right to challenge the interception had a reasonable expectation of privacy in the place where the wiretap was used. *See, e.g.*, *O'Connor v. Ortega*, 480 U.S. 709, 711-12 (1987). We hold that the district court correctly determined that Antonio and Francisco Gonzalez had such a reasonable expectation of privacy at the Blake Avenue office that they owned and in which they had substantial control of the day-to-day operations.

[12] The Supreme Court has held that owners of the premises where an illegal wiretap occurs have standing to challenge the interception, even if the owners did not participate in the intercepted conversations. *Alderman,* 394 U.S. at 175-76; *see also King*, 478 F.2d at 506 ("[A] defendant may move to suppress the fruits of a wire-tap only if his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, *or if such conversation occurred on his premises*.") (emphasis added). Although the government concedes that the Gonzalezes owned the Blake Avenue property, it suggests that *Alderman* and *King* are distinguishable because the premises at issue in those cases were residential, not commercial properties, and because it is well-established

that an individual's expectation of privacy is lower in a commercial property. *See, e.g*, *New York v. Burger*, 482 U.S. 691, 700 (1987). At least in the instant case, we do not find this to be a distinction that makes a difference.

**[13]** In determining whether the Gonzalezes had a reasonable expectation of privacy over the intercepted calls, it is important to assess the nature of the location where these conversations were seized. *See O'Connor*, 480 U.S. at 715 (1987) ("[T]he reasonableness of an expectation of privacy . . . is understood to differ according to context . . . ." ) The Blake Avenue office was a small, family-run business housing only 25 employees at its peak. In such an office, individuals who own and manage the business operation have a reasonable expectation of privacy over conversations taking place on the office's telephone lines. In reaching this result, we do not rule out the possibility that the hands-off executives of a major corporate conglomerate might lack standing to challenge all intercepted conversations at a commercial property that they owned, but rarely visited. Instead, we simply hold that because the Gonzalezes were corporate officers and directors who not only had ownership of the Blake Office but also exercised full access to the building as well as managerial control over its day-to-day operations, they had a reasonable expectation of privacy over calls made from, to, and within the premises.

## CONCLUSION

In conclusion, we affirm the district court's determination that defendants made a showing sufficient to require a *Franks* hearing, however, we decline to find an implicit *Franks* violation by the district court with respect to any of the wiretap applications. In addition, we affirm the district court's finding that the government failed to prove the necessity for the Blake Avenue wiretap. Thus, we also affirm the district court's order suppressing any evidence resulting from this wiretap. Lastly, we uphold the district court's determination that Anto-

nio and Francisco Gonzalez have standing to challenge all the calls intercepted pursuant to the Blake Avenue wiretap.

**AFFIRMED.**