**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4782**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

DEMETRIUS DARRELL DAVIS, a/k/a Meatman,

Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, District Judge. (1:16-cr-00351-CCB-1)

Argued: May 9, 2019                    Decided: August 2, 2019

Before DIAZ, FLOYD, and RICHARDSON, Circuit Judges.

Affirmed by unpublished opinion. Judge Diaz wrote the opinion, in which Judge Richardson joined. Judge Floyd wrote an opinion concurring in the judgment.

**ARGUED:** Erek Lawrence Barron, WHITEFORD, TAYLOR & PRESTON, LLP, Bethesda, Maryland, for Appellant. Derek Edward Hines, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Michael Lawlor, BRENNAN, MCKENNA & LAWLOR, CHTD., Greenbelt, Maryland, for Appellant. Robert K. Hur, United States Attorney, Jason D. Medinger, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Demetrius Davis was convicted on a drug conspiracy charge and sentenced to ten years in prison. He filed two suppression motions before trial, one alleging an illegal wiretap of his phone and the other alleging an illegal search of a vehicle. The district court denied both motions, and Davis now appeals. We affirm the judgment.

I.

A.

Davis's prosecution arose from a joint federal–state investigation of a cocaine trafficking ring on Maryland's Eastern Shore. The investigation originally focused on Tarron Fletcher, Tyandre Johnson, and several of their associates. For several years, law enforcement agents used traditional investigative methods against those suspected traffickers, including controlled buys with confidential sources, pen registers, GPS trackers, pole cameras, trash pulls, and package searches at the Post Office. By 2016, they had gathered enough evidence to indict the known conspirators on drug charges. But the agents sought more evidence to take down "the organization as a whole." J.A. 74.

In pursuit of that goal, they applied for a wiretap of Johnson and Fletcher's phones. In their application, the agents explained why traditional investigative techniques would not reveal the cocaine supplier. In their estimation, confidential sources or undercover officers couldn't get close to sources of supply; visual surveillance, GPS tracking, trash pulls, search warrants, and similar methods had failed to reveal anyone higher in the operation; and no one with knowledge of the conspiracy was likely to testify under oath.

3

A federal magistrate judge agreed and approved the wiretap application under Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

When the wiretap was approved, agents were not aware of Davis or his role in the conspiracy. But through the wiretap, they captured several phone and text conversations involving Davis. In two calls on the same day, Davis and Fletcher used what appear to be coded terms (e.g., "that girl Crystal") to discuss—as the agents interpreted it—the quality of certain kilograms of cocaine. In later text messages, Davis and Fletcher continued that discussion and arranged a meeting in which Davis would supply Fletcher with drugs. Using that information, agents followed Davis as he drove to a meeting with Fletcher.

In another call, Johnson complained to Davis about receiving drugs at inopportune times and being forced to repay debts early. Soon after, Johnson sent a text message to Davis reading, "I'm gonna give your money cuz but don't come around me with drugs no more man . . . u bad business." J.A. 153. The agents also used pen registers and toll analysis to generate a list of calls between members of the conspiracy.

Suspecting that Davis was supplying cocaine to Fletcher and Johnson, agents sought a Title III wiretap order for Davis's cellphone. In the affidavit supporting their wiretap application, the agents admitted that (for the most part) they had not tried traditional investigative techniques against Davis. But they detailed why such techniques would likely fail if tried.

In the agents' understanding, existing confidential sources had no access to Davis and, given his role in the conspiracy and the rural area where he lived, it wouldn't be feasible to get a confidential source or undercover officer near him. Several factors would

4

have made visual surveillance ineffective: cars or officers would stand out in a rural area, Davis used several different cars, and the conspirators had employed countersurveillance tactics to avoid being followed. The agents didn't have enough information to know where Davis kept his suspected supply, so search warrants would have been ineffective. Interviews and subpoenas were unlikely to get anyone with knowledge of the conspiracy to testify (much less to testify honestly). Trash searches and pole cameras would be impractical at Davis's remote house. Pen registers, toll analysis, and mail covers[1] were unlikely to generate useful information. And neither the original wiretap nor a financial investigation of the conspirators was bearing further fruit.

A federal magistrate judge authorized the wiretap on Davis's phone, finding that there was probable cause that he was involved in the drug conspiracy and that a wiretap was necessary because other methods were unlikely to succeed. Using information from that wiretap and from GPS tracking of Davis's Mercedes, agents observed what they believed to be Davis supplying drugs to his coconspirators.[2] They also took aerial and ground-based photos and video of Davis's property. With this new evidence, they obtained federal search warrants for Davis's house and for his Mercedes.

---

[1] Federal investigators may ask the Post Office to generate a "mail cover," which is a compiled list of the names and addresses on all USPS mail sent to a particular address. *See* 39 C.F.R. § 233.3.

[2] The agents had state court authorization to place a GPS tracker on the Mercedes before they applied for a wiretap order. But they didn't place the tracker on the car until after the wiretap was approved.

A team of agents executed the search warrants early one morning. Several agents entered Davis's house, separating Davis and his girlfriend for questioning. Davis orally acknowledged that he had been advised of his *Miranda* rights, and he responded to questions without invoking his rights. A detective asked Davis about a white box truck parked in his driveway, which investigators had seen on the premises before. Davis denied ownership (or even knowledge) of the truck. But after questioning Davis, the detective found the truck's keys in Davis's house.

While some agents searched the house, a K9 officer walked a drug-sniffing dog around the back of Davis's property and the vehicles parked there. After the detective found the keys, he asked the K9 officer to bring the dog to the truck parked in the driveway. The dog alerted to the smell of narcotics, and the agents opened the truck. Inside, they found a small quantity of cocaine and $625 in cash.

B.

A federal grand jury indicted Davis, Johnson, and Fletcher on one count of conspiracy to distribute and possess with intent to distribute 500 or more grams of cocaine. *See* 21 U.S.C. §§ 841(a)(1), 846. Johnson and Fletcher pleaded guilty. Davis pleaded not guilty and filed two suppression motions. The first motion alleged that the wiretap of Davis's phone lacked probable cause and that none of the wiretaps obtained by the agents were necessary. The second motion alleged that the search of the truck on Davis's property violated the Fourth Amendment. The district court denied both suppression motions.

First, the district court addressed the wiretaps of Johnson and Fletcher's phones. It held that those wiretaps were necessary because they were the only way to identify the

6

conspirators' source of supply. Then, the district court addressed the wiretap of Davis's phone. It held that there was probable cause for the wiretap and that it was necessary because other investigative methods would have been ineffective. Last, the district court addressed the search of the truck, concluding that there was no Fourth Amendment violation because Davis had no reasonable expectation of privacy in the truck after denying that he had any interest in it. As an alternative to that holding, the district court held that the warrant and the automobile exception to the warrant requirement each independently justified the search.

A jury convicted Davis of conspiracy. The district court sentenced him to ten years in prison followed by five years of supervised release. This appeal followed.

## II.

Davis's first ground for appeal concerns his motion to suppress conversations captured via the Title III wiretaps. Title III allows the government to ask a federal district court for a wiretap order during investigations of certain crimes. 18 U.S.C. § 2516(1). To approve the order, the district court must make several findings. *Id.* § 2518(3). Three of the required findings are at issue in this appeal, findings that: (1) there is probable cause that the target individual has committed or will commit a crime enumerated in Title III; (2) there is probable cause that the wiretap will intercept communications about that crime; and (3) normal investigative procedures have failed, would be too dangerous, or reasonably appear unlikely to succeed. *Id.* § 2518(3)(a)–(c). The government must supply an affidavit with evidence sufficient to support these findings. *Id.* § 2518(1).

7

Davis contends that the government lacked probable cause to wiretap his phone and that neither the original wiretap of Johnson and Fletcher nor the subsequent wiretap of Davis was necessary. As we explain, however, we hold that the district court did not err by denying this suppression motion.[3]

## A.

Though Davis primarily challenges the wiretap of his phone, he also appears to contest the necessity of wiretapping Johnson and Fletcher's phones.[4] As he argued in the district court, Davis appears to contend on appeal that those wiretaps weren't necessary because agents had already uncovered substantial evidence against Johnson and Fletcher by traditional means. The district court concluded that the wiretaps were necessary, however, because traditional methods had failed to reveal Johnson and Fletcher's source of supply.

We review a district court's determination of necessity under Title III for abuse of discretion. *United States v. Wilson*, 484 F.3d 267, 280 (4th Cir. 2007). Though the

---

[3] As an alternative ground for affirming, the government contends that suppression is unwarranted because agents relied on the wiretap orders in good faith. Because we hold that the orders satisfy Title III's requirements, we don't address whether the good faith exception applies to statutory suppression under Title III.

[4] A criminal defendant must be an "aggrieved person" to move to suppress under Title III, 18 U.S.C. § 2518(10)(a), defined as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed," *id.* § 2510(11). Davis says he is an aggrieved person because his communications were intercepted during the wiretap of Johnson and Fletcher. The government does not dispute that characterization, so we will assume it to be true for purposes of this appeal.

government must provide specific facts—not boilerplate—showing necessity, we owe "considerable deference" to the district court's determination. *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995) (quoting *United States v. Smith*, 31 F.3d 1294, 1298 (4th Cir. 1994)). It is appropriate to consider necessity "in a practical and commonsense fashion that does not hamper unduly the investigative powers of law enforcement agents." *Wilson*, 484 F.3d at 281 (quoting *Smith*, 31 F.3d at 1297). The government's burden to prove necessity therefore "is not great." *Id.* at 281 (quoting *Smith*, 31 F.3d at 1297).

It is true that even before the wiretaps, agents likely had enough evidence to support charges against Johnson and Fletcher. But the agents' goal was to find Johnson and Fletcher's supplier and to uncover the full trafficking conspiracy. In their affidavit, the agents sufficiently demonstrated that the methods they had tried—confidential sources, trash pulls, visual surveillance, package searches, etc.—didn't reveal Johnson and Fletcher's source of supply.

In many other cases, we have affirmed wiretaps intended to reveal the higher levels of a conspiracy when ordinary investigative methods could not reach them. *See, e.g.*, *United States v. Galloway*, 749 F.3d 238, 242–43 (4th Cir. 2014); *Smith*, 31 F.3d at 1297–98; *United States v. Leavis*, 853 F.2d 215, 222 (4th Cir. 1988); *United States v. Clerkley*, 556 F.2d 709, 714–15 (4th Cir. 1977). As in those precedents, the wiretap order was appropriate in this case because the government demonstrated that ordinary methods had failed or would likely fail to reveal the source of Johnson and Fletcher's supply.

B.

9

We turn next to Davis's challenge to the wiretap of his own phone. Davis gives two reasons for why the district court erred. First, he says that the wiretap application did not sufficiently allege probable cause. Second, he says that the application did not sufficiently allege that a wiretap was necessary. We disagree with Davis on both issues.

1.

The probable cause standard for a Title III wiretap order is the same as the probable cause standard for a warrant. *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir. 1983). Probable cause for a wiretap order thus exists when the facts warrant a person "of reasonable caution to believe that an offense has been or is being committed." *Berger v. New York*, 388 U.S. 41, 55 (1967). On appeal, we afford "[g]reat deference" to the magistrate judge's assessment of the facts and ask only "whether the magistrate had a substantial basis for his conclusion that probable cause existed." *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992).

We agree with the district court that the magistrate judge had a substantial basis for concluding that there was probable cause to support the wiretap of Davis's phone. The calls and texts intercepted through the wiretaps of Fletcher and Johnson's phones strongly suggested that Davis was involved in drug trafficking. For example, the agents captured calls between Fletcher and Davis in which the men used a fairly transparent code word—"crystal"—to discuss concerns about the quality of cocaine in their possession. The conversations suggested that Davis supplied cocaine to Fletcher, and in one call, Davis appeared to reiterate trafficking-related conversations he'd had with other people. After that, text messages between Davis and Fletcher appeared to describe (in coded language)

10

an arrangement in which Davis would supply narcotics to Fletcher. In another call, Johnson complained that Davis was requiring Johnson to receive drugs without notice and asking for repayment of drug debts at inopportune moments. And in a subsequent text, Johnson told Davis that he would repay his debts but didn't want to receive any further supplies of drugs. These conversations would lead a reasonable person to believe that Davis was participating in the drug crimes under investigation, which suffices to establish probable cause to wiretap his phone.

Davis urges us not to rely on the agents' understanding of the coded terms. But the agents' interpretation of the coded terms—which ties the wiretapped conversations to cocaine trafficking—was reasonable. The coded language was fairly transparent, after all. *See, e.g.*, J.A. 141 ("She's just straight like Crystal. She ain't really got too much smell to her at all. . . . I picked one up and put it on my tongue . . . she took a while just to you know, to numb it."). And we agree that the wiretapped conversations suggest that Davis was involved in drug trafficking.

2.

Davis also challenges the district court's conclusion that the wiretap of his phone was necessary. The government concedes that it didn't perform a traditional investigation of Davis before seeking a wiretap for his phone. So, the question is whether the government proved that normal investigative methods reasonably appeared unlikely to succeed. As noted, our review of the necessity determination is deferential. *See Wilson*, 484 F.3d at 280; *Oriakhi*, 57 F.3d at 1298.

11

The government made a sufficient showing that ordinary methods would have been ineffective against Davis. Because of where Davis lived, and his suspected role as a supplier for the conspiracy, getting a confidential source or undercover officer near him would not have been feasible. Visual surveillance, cameras, and trash pulls would likely have been ineffective and risky because of the remote location of his house. Interviews and subpoenas were unlikely to yield honest testimony. And agents lacked enough information to use search warrants effectively.

Davis contends that because some ordinary investigative methods were successful against Johnson and Fletcher, who lived in the same area as Davis, they likely would have been successful against Davis too. True, ordinary methods had revealed small-scale drug dealing by Johnson and Fletcher. But they had not led agents to their source of supply, and the agents reasonably concluded that they would not have revealed anything useful about Davis, who appeared (based on the wiretapped conversations) to be the supplier. To the extent that other methods, such as visual surveillance or GPS tracking, were useful later in the investigation of Davis, it was only because of information obtained from the wiretap.[5]

---

[5] Davis points to a case in which the Ninth Circuit held that the government failed to prove necessity when it applied for a wiretap order after only minimal investigation. *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1114–15 (9th Cir. 2005). But there, the Ninth Circuit reviewed whether the wiretap application complied with Title III de novo, *id.* at 1111, and it considered several unused investigative methods to be promising, *id.* at 1114–15. We (on the other hand) apply a deferential standard of review to the question of necessity. And, unlike in *Gonzalez,* none of the unused investigative methods in this case appear to have been promising.

The government supported its need for a wiretap of Davis's phone with specific facts showing why other investigative methods reasonably appeared unlikely to succeed. As a result, the district court didn't abuse its discretion in finding that the wiretap was necessary.

III.

Davis next argues that the search of the truck on his property violated his Fourth Amendment rights. The district court held (and we agree) that Davis's Fourth Amendment challenge fails because he lacked a reasonable expectation of privacy in the truck.[6]

A district court may only suppress evidence on the basis that a search was unconstitutional if the search "infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Rakas v. Illinois*, 439 U.S. 128, 140 (1978). In this threshold inquiry (sometimes called Fourth Amendment standing), the defendant has the "burden of establishing that he had a reasonable expectation of privacy" in the area or object searched. *United States v. Stevenson*, 396 F.3d 538, 547 (4th Cir. 2005); *see Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018) ("[A] person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search . . . .").

---

[6] Given our holding on this issue, we don't reach the government's alternative arguments that the warrant covered the truck, that the search fell within the automobile exception, or that the officers relied in good faith on the warrant or on judicial precedents.

If the defendant lacked (or abandoned) a reasonable expectation of privacy in the area or object searched, a motion to suppress evidence from that search fails as a matter of law. *See United States v. Williams*, 538 F.2d 549, 550–51 (4th Cir. 1976). We review the district court's legal conclusions about expectations of privacy de novo and its factual findings for clear error. *Han*, 74 F.3d at 541, 544–45.

Under our precedent, a person abandons any reasonable expectation of privacy in certain property for Fourth Amendment purposes when his words or actions can reasonably be understood to disclaim any privacy interest in that property. *See United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995) ("[A] person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property."). In *United States v. Han*, for example, we concluded that a defendant abandoned any privacy interest in a suitcase found next to him in his home by denying that the bag was his. 74 F.3d 537, 540, 544–45 (4th Cir. 1996). In a similar case, we determined that a defendant abandoned his privacy interest in a briefcase and a typewriter case found in his hotel room when he claimed that they "did not belong to him and that he had no idea to whom [they] belonged." *Williams*, 538 F.2d at 550–51. We have reached the same conclusion in cases where defendants have disclaimed ownership of bags that otherwise appeared to belong to them.[7]

---

[7] *See Leshuk*, 65 F.3d at 1110–11 (backpack and garbage bags found by defendant); *United States v. Clark*, 891 F.2d 501, 506 (4th Cir. 1989) (suitcase found at airport baggage claim which matched defendant's baggage claim check); *United States v. Washington*, 677 F.2d 394, 395–96 (4th Cir. 1982) (suitcase in defendant's possession at the airport); *cf. United States v. McNeil*, No. 92-5421, 1993 WL 347524, at *3 (4th Cir. Sept. 7, 1993)

14

In this case, Davis expressly disclaimed possession (or even knowledge) of the truck. J.A. 427 ("It's not my white box truck. I don't know anything about it."). His words mirror the language we have found to constitute abandonment of a privacy interest in an object. *See, e.g.*, *Han*, 74 F.3d at 540 ("Han responded that it was not his bag . . . ."); *Williams*, 538 F.2d at 550 ("Defendant informed the agents that [the typewriter case] did not belong to him and that he had no idea to whom it belonged."); *Washington*, 677 F.2d at 395 ("It's not my bag. I don't care what you do . . . ."). While these precedents concerned bags, the same principle should apply to cars. Vehicles are chattel possessions like bags, and individuals generally don't have greater privacy interests in vehicles than in other possessions.

Davis contends that this court uses a multifactor test to determine if a defendant had a reasonable expectation of privacy. In his view, relevant factors include the location of the truck, the fact that investigators had seen it on Davis's property before, and the key found inside Davis's house. As a general principle, we do employ a multifactor test. *See, e.g.*, *United States v. Castellanos*, 716 F.3d 828, 833–34 (4th Cir. 2013); *United States v. Horowitz*, 806 F.2d 1222, 1225 (4th Cir. 1986). But we have not done so when a defendant disclaims any interest in an object. *See, e.g.*, *Han*, 74 F.3d at 544–45; *Leshuk*, 65 F.3d at 1110–11; *Williams*, 538 F.2d at 550. Instead, we have found the disclaimer dispositive, even if agents have reason to know that the defendant does in fact own the property to be

(driver and passengers had no privacy interest in a motel key found in a search of the car they were in because they all said the key wasn't theirs).

15

searched.[8]  *See Han*, 74 F.3d at 544–45.  Because Davis disclaimed any interest in the box truck, the district court correctly denied his motion to suppress the drugs seized from the truck.

IV.

For the reasons given, we affirm the district court's judgment.

*AFFIRMED*

---

[8] Davis also makes a brief argument that he didn't disclaim ownership of the truck. As Davis would have it, the detective asked him about a white box truck in his driveway when, in Davis's view of the facts, the truck was actually parked on the property of the neighboring lot.  Thus, Davis says his refusal to admit ownership of a truck in his driveway didn't extend to a truck that agents found on the adjoining parcel.  The problem for Davis is that the district court found that the "white box truck was parked such that it was at least partly on the gravel driveway" of Davis's property.  J.A. 624.  The court's finding is not clearly wrong, so we will not disturb it.  *See Leshuk*, 65 F.3d at 1111.

FLOYD, J., concurring in the judgment:

I agree that we must, in accordance with our precedent, affirm the district court's denial of Davis's motion to suppress. But with great respect for my good colleagues, I am not convinced that our precedent requires us to hold that a person categorically abandons her interest in her property when she disclaims ownership of the property prior to a search by law enforcement, such that no circumstances other than the person's verbal disclaimer are relevant to the abandonment analysis. While broad wording in some of our cases points in that direction, it seems to me that we have not subjected the question to a thorough analysis or made it an explicit holding. Nor, in my view, does the case at hand require us to do so: the parties have briefed the question only scantily, and even under a totality-of-the-circumstances approach, I believe we would affirm the district court's conclusion that Davis abandoned his truck before it was searched. That being said, I concur in the judgment.