**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 16, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

NATHAN ARCHULETA,

    Defendant-Appellant.

No. 06-2217

(D.C. No. CR-05-2045-LH)
(D. New Mexico)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Chief Judge, **BRISCOE** and **GORSUCH**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is, therefore, ordered submitted without oral argument.

Defendant Nathan Archuleta entered a conditional plea of guilty to one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

924(a)(2), and was sentenced to a term of imprisonment of 37 months. Archuleta now appeals, claiming the district court erred in denying his motion to suppress evidence seized from his home and vehicle. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

Shortly before 9:30 p.m. on August 7, 2005, a shooting occurred at Brookside Park in Farmington, New Mexico. Based upon witness interviews at the park and phone calls from four individuals who volunteered information, Detective Brandon Lane of the Farmington Police Department prepared an affidavit in support of a search warrant for the home and vehicle of defendant Archuleta. In the affidavit, Lane alleged as follows:

> On August 7, 2005 at approximately 2129 hours officers of the Farmington Police Dept. were dispatched to the area of Brookside Park in reference to a shooting. It is unknown how many shots were fired but a total of six people were injured, including a one-year old female who was shot in the back. There were also two adult females, one being the infant's mother who was shot while holding her daughter; and three adult males. One of the adult males was in critical condition and not expected to survive. Several officers arrived on scene, one of whom was Officer Dougherty. Officer Dougherty interviewed two witnesses identified as Marcela Tarwater and Aida Loya. Both stated they saw an older black Cougar passenger car driving around the area immediately before the shots were fired. They also described the driver as a dark skinned, heavy set Hispanic male with a goatee beard. These two witnesses also described a subject in [the] crowd who returned fire and a cartridge case was located in the parking lot that would substantiate their statements.

> As the investigation progressed four separate citizens who wished to remain anonymous contacted authorities with suspect information. The first caller was a confidential informant of Officer O'Donnell of the Farmington Street Crimes Unit. Officer O'Donnell has received reliable information from this particular informant on past occasions. This confidential

informant identified the shooter by name as Nathan Archuleta and the leader of a street gang identified as Tortilla Flats.

The next citizen, who received information from a family member who did not want to come forward, identified the suspect with a first name of "Nathan" but also stated that Nathan went by a street name of "Enemy." This citizen also advised me that this shooting was possibly in retaliation for a fight that "Enemy" was involved in recently and apparently lost. The person or persons who beat up "Enemy" previously were identified as "South Side Loco" gang members. The victims of this Brookside shooting were also reportedly associated with "South Side Locos."

The other anonymous citizen is a relative of one of the victims and fears retaliation and does not wish to be identified. The citizen described the shooter by a street name of "Enemy." This street name was confirmed to be a gang moniker of Nathan Archuleta, a member of Tortilla Flats, through the Farmington Police Street Crimes Unit.

The forth [sic] citizen placed an anonymous call to the PBX operator for the City of Farmington and stated the shooter's name was "Enemy" and is a member of the "Tortilla Flats."

I also contacted another witness at the San Juan Regional Emergency Dept. who advised she was in the Brookside parking lot when the shooting occurred. This witness was identified as Annie Reyes. Ms. Reyes stated that after the shooting she came to the hospital to check on the wellbeing [sic] of the injured and she saw a black two door passenger car drive by very slowly and the occupants screamed "South Side sucks!" to the crowd outside the emergency room. Reyes believed the occupants of this car were "them," from the shooting, although she did not see this vehicle at Brookside.

I obtained a booking photo of Nathan Archuleta and his physical characteristics match those given by the witnesses who saw the driver of the black Cougar at Brookside Park. I was also provided Archuleta's vehicle information by the Street Crimes Unit. Registered to Archuleta is a 2001 dark blue Mercury Cougar two door passenger car displaying New Mexico license plate GWG373. A vehicle matching this description and displaying this plate was found to be parked in the driveway of 6101 Marseille. This residence is under an active utilities account of Clara Archuleta and is believed to be the home of Nathan Archuleta's parents. This address is also

listed on the license plate of the vehicle registered to Nathan Archuleta. Officers contacted Nathan Archuleta at this address and he was uncooperative with their investigation.

This vehicle registered to Nathan Archuleta matches the description of the vehicle seen by the two witnesses at the shooting scene as well as Ms. Reyes' description of the vehicle that drove by to heckle the people visiting the shooting victims at the ER.

Based upon the above witness statements and information provided by concerned citizens, along with the fact that Archuleta has a vehicle matching that observed at the scene and at the ER, I feel probable cause exists and a seizure of the above vehicle is necessary to recover evidence of the crime. No cartridge casings have yet to be located at the scene and based on witness statements it appears that the shooter(s) were seated in a vehicle at the time and I believe it logical that the cartridge casings would be ejected into the vehicle's interior and not out onto the ground. I also believe that the interior of the vehicle and items inside the vehicle could contain trace evidence including gunshot residue, latent fingerprints, hairs, and/or fibers left by a suspect(s). Ammunition and/or the weapons themselves could also be concealed in this vehicle.

I also believe that due to the fact this vehicle has been parked at the Archuleta residence for a length of time, evidence from the vehicle may have been moved into the residence to help conceal and/or destroy such evidence as listed above.

Based on the above information, I respectfully request this Court to issue a search warrant for the above-listed property and vehicle.

ROA, Vol. I, Doc. 20, Exh. 1 at 2-3.

A judge from the Magistrate Court of San Juan County, New Mexico, issued the requested search warrant and it was executed on the morning of August 8, 2005. During the search, police found an inoperable handgun magazine in a vehicle in the driveway, an unloaded handgun with no magazine between the mattresses in a bedroom believed to have been used by Archuleta, ten Remington brand .22 caliber bullets in a plastic baggie

in the pocket of a pair of jeans at the foot of the bed in that same bedroom, and a rifle located in another room determined to belong to Archuleta's father. Archuleta was arrested and held on suspicion of attempted murder in the park shooting. The police subsequently determined that the firearm seized from Archuleta's home was not used in the shooting. Thus, Archuleta was never charged in connection with the park shooting. Because, however, Archuleta had previously been convicted of a felony offense, the matter was referred to federal authorities and, on September 13, 2005, a federal grand jury returned an indictment charging Archuleta with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

On October 13, 2005, Archuleta filed a pleading entitled "Motion to Void the Search Warrant and the Fruits of the Search." ROA, Vol. I, Doc. 13. In his suppression motion, Archuleta argued that the affidavit submitted by Detective Lane in support of the search warrant falsely stated that a confidential informant identified Archuleta as the "shooter," rather than a "suspect," in the Brookside Park shooting. Archuleta also argued that Detective Lane's affidavit was false to the extent it stated he was "uncooperative" when he was initially approached and questioned by the police. Additionally, Archuleta complained that Detective Lane's affidavit failed to "recite any of the underlying circumstances from which the [confidential] informant reached his conclusion" that Archuleta was involved in the shooting. Id. at 9. Archuleta asserted that, in light of his allegations, the district court was obligated to conduct an evidentiary hearing on the motion.

The government, in its response to Archuleta's motion, asserted that "[t]he statements [Archuleta] claim[ed] to be false [we]re true . . . ." Id., Doc. 17 at 2. The government further asserted that "[t]he affidavit in support of the search warrant under the totality of the circumstances analysis established probable cause for a search warrant to issue with or without the alleged false statements." Id. Accordingly, the government argued that no evidentiary hearing was required on Archuleta's motion.

On December 22, 2005, the district court denied Archuleta's motion, noting it was "not convinced that the distinction drawn by [Archuleta] between 'shooter' or 'suspect' and 'uncooperative' or 'cooperative' [established] that Detective Lane made a false statement in any manner at all, much less, knowingly and intentionally, or with reckless disregard for the truth." Id., Doc. 26 at 9. The district court further noted that, "even if [it] were to so find, the allegedly false statements [we]re in no way necessary to the finding of probable cause." Id. "Indeed," the district court concluded, "even striking the portions of the affidavit to which [Archuleta] object[ed] and inserting his proposed 'corrections,' ample cause exist[ed] on the face of the affidavit to justify issuance of the search warrant." Id.

On March 9, 2006, Archuleta entered a conditional plea of guilty, reserving his right to appeal. On June 20, 2006, the district court sentenced Archuleta to a term of imprisonment of 37 months.

II.

On appeal, Archuleta contends the district court erred in resolving his suppression

-6-

motion without first conducting an evidentiary hearing. In support of that contention, Archuleta argues that he "made a substantial preliminary showing that Det[ective] Lane made intentional or reckless misstatements and omitted facts required to prevent technically true statements in the affidavit from misleading the [state court] magistrate." Aplt. Br. at 6. Thus, Archuleta argues, he "was entitled under the Fourth Amendment to an evidentiary hearing to determine the veracity of the affidavit . . . ." Id. at 7.

In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court held that affidavits supporting search warrants are presumed to be valid and that a criminal defendant may make a post hoc challenge to a facially sufficient affidavit only in very limited circumstances. Id. at 171-72. "Under Franks, a[n] [evidentiary] hearing on the veracity of the affidavit supporting a warrant is required if the defendant makes a substantial showing that the affidavit contains intentional or reckless false statements[, or material omissions,] and if the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." United States v. Kennedy, 131 F.3d 1371, 1376 (10th Cir.1997) (citing Franks, 438 U.S. at 155-56); see United States v. McKissick, 204 F.3d 1282, 1297 (10th Cir. 2000) (applying the Franks standard to material omissions in affidavit). In other words, "no hearing is required" "if, when material that is the subject of the alleged falsity," "reckless disregard," or material omission "is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause . . . ." Franks, 438 U.S. at 171-72.

The district court in this case refused, after reviewing the affidavit at issue and

Archuleta's motion and supporting materials, to conduct an evidentiary hearing. More specifically, the district court concluded that Archuleta failed to establish "that Detective Lane made a false statement in any manner at all, much less, knowingly and intentionally, or with reckless disregard for the truth," and that "even if the Court were to so find, the allegedly false statements [we]re in no way necessary to the finding of probable cause." ROA, Vol. I, Doc. 26 at 9.

To date, we have not expressly indicated what standard of review applies to a district court's refusal to conduct a Franks hearing. "[T]he [other] circuits are split as to the proper standard of review" on this issue. United States v. Stewart, 306 F.3d 295, 304 (6th Cir. 2002). Some "employ [a] clear error" standard of review. Id.; see United States v. Buchanan, 985 F.2d 1372, 1378 (8th Cir. 1993) (employing clear error standard); United States v. Skinner, 972 F.2d 171, 177 (7th Cir. 1992) (same); United States v. Hadfield, 918 F.2d 987, 992 (1st Cir. 1990) (same); United States v. One Parcel of Property, 897 F.2d 97, 100 (2d Cir. 1990) (same). Others apply a de novo standard of review. Id.; see United States v. Gonzalez, Inc., 412 F.3d 1102, 1110 (9th Cir. 2005) (applying de novo standard); United States v. Martin, 332 F.3d 827, 833 (5th Cir. 2003) (same). We conclude it is unnecessary to resolve the issue in this case because, for the reasons outlined below, we would affirm the district court's under either standard of review.

*a) Alleged false statements in the supporting affidavit*

Archuleta contends that the affidavit prepared by Detective Lane and submitted in

support of the request for the search warrant contained two false statements. First, Archuleta contends that the affidavit falsely stated that the confidential informant who spoke to Officer O'Donnell identified Archuleta as the "shooter" in the Brookside Park shooting. In support of this contention, Archuleta points to a subsequent affidavit that Detective Lane prepared in support of a search warrant for the home of another suspect named Alex Wenger. In that affidavit, Detective Lane noted that several citizens voluntarily provided information to the authorities regarding possible suspects in the Brookside Park shooting, and that a "confidential informant of Officer O'Donnell of the Farmington Street Crimes Unit . . . contacted Officer O'Donnell within two hours of the shooting" and "identified three *suspects* by name as Alex Wenger, Jeremy Archuleta, and Nathan Archuleta." ROA, Vol. I, Doc. 13 at 5 (emphasis and italics added). According to Archuleta, this statement undercuts the veracity of Detective Lane's statement in the first affidavit that the confidential informant identified Archuleta as the "shooter." Accordingly, Archuleta contends that the first affidavit should have read, as did the subsequent affidavit, that the confidential informant "identified three suspects by name as Alex Wenger, Jeremy Archuleta, and Nathan Archuleta."

We conclude that Archuleta has failed to make a substantial showing that Detective Lane's reference in the affidavit to Archuleta being identified as the "shooter" was false, much less that Detective Lane knowingly and intentionally, or with reckless disregard for the truth, used the term knowing it was false. As noted by the government in its response to Archuleta's motion to suppress, Archuleta's arguments rest on the

mistaken notion that the terms "shooter" and "suspect" are mutually exclusive. By indicating in the first affidavit that Archuleta had been identified as the "shooter," Detective Lane was also clearly implying that Archuleta had been identified as the key "suspect" in the shooting. Thus, the first affidavit was entirely consistent with the second affidavit's reference to Archuleta as one of three "suspects." Moreover, because the subsequent affidavit was in support of a search warrant for another suspect's house, it was not critical that Detective Lane specify that Archuleta had been identified by the confidential informant as the "shooter."

The second allegedly false statement pointed to by Archuleta is Detective Lane's statement in the affidavit that Archuleta was "uncooperative" when officers contacted him at his residence after the shooting. In support of this assertion of falsity, Archuleta cites to a supplemental narrative from Detective Corporal Robert Perez, dated August 10, 2005 (two days after Detective Lane's affidavit was prepared), which discussed the investigative efforts on the night of the shooting:

> After completing the initial investigation at the hospital, I requested that we proceed to the Farmington Police Department in order to begin coordinating the information known to this point. I requested to know who else was out and who was coordinating the investigative effort. Det. Lane informed me that Det. Smerglia was out and had assisted Det. Brown at the crime scene. Sgt. Burch was also out and he had joined the Street Crimes Unit and was assisting them to search for and interview suspects. While at the hospital, Det. Lane spoke with Sgt. Burch and had been informed that they contacted Nathan Archuleta at his residence. Sgt Burch conducted a brief interview and obtained information related to an alibi that Archuleta provided. It was unclear if a request was made for Archuleta to come into the Farmington Police Department (FPD) for a detailed statement or if a Gunshot Residue collection was requested. I contacted Sgt. Burch back and asked if this had

been done. He informed me that Archuleta denied involvement so neither request was made.

Id., Doc. 26 at 7. Archuleta contends that not only should Detective Lane's affidavit not have used the word "uncooperative," it should have instead stated:

Police officers contacted Nathan Archuleta at his residence. Sgt. Burch conducted a brief interview and obtained information related to an alibi that Archuleta provided. Archuleta denied involvement in the shooting.

Id.

At the outset, we agree with Archuleta that Detective Lane's use of the word "uncooperative" could reasonably be construed as inconsistent with Detective Corporal Perez's supplemental narrative. In particular, Detective Lane's use of the word "uncooperative" could reasonably be construed as suggesting that Archuleta refused to respond to questions by the officers who visited his residence following the shooting, when in fact Detective Corporal Perez's supplemental narrative indicates that Archuleta responded to questioning, denied involvement in the shooting, and offered an alibi for his whereabouts at the time of the shooting. Further, Detective Corporal Perez's supplemental narrative clearly indicates that Detective Lane was aware of this information, and in fact relayed it to Detective Corporal Perez in the hours after the shooting. What is unclear is when Detective Lane himself learned of this information and whether he relayed that information to Detective Corporal Perez before or after he prepared his affidavit in support of the search warrant for Archuleta's residence. Thus, it is not clear whether Detective Lane knowingly and intentionally, or with reckless

-11-

disregard for the truth, used the term "uncooperative" in his affidavit.

Importantly, however, it is unnecessary to resolve this issue because, even if the term "uncooperative" is omitted from Detective Lane's affidavit and replaced with the language suggested by Archuleta, the affidavit still clearly establishes probable cause for the search warrant. To begin with, the affidavit indicates that two witnesses at the scene of the shooting stated they observed a car that was determined by the police to be similar to the one driven by Archuleta. In addition, these same two witnesses gave descriptions of the driver of the car that Detective Lane determined, based upon his review of a booking photo of Archuleta, to match Archuleta's physical characteristics. Aside from these two witnesses, four other citizens voluntarily contacted the authorities and identified Archuleta, either by his real name or his street name, as the shooter. Together, this information clearly indicated that Archuleta was involved in the shooting and established a fair probability that contraband or evidence of the crime could be found either in Archuleta's vehicle or his residence. See generally Illinois v. Gates, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."); United States v. Soderstrand, 412 F.3d 1146, 1152 (10th Cir. 2005) ("An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the 'fair probability that contraband or evidence of

a crime will be found in a particular place.'") (quoting United States v. Rice, 358 F.3d 1268, 1274 (10th Cir. 2004)).

*b) Other alleged deficiencies in the supporting affidavit*

Archuleta asserts several other challenges to Detective Lane's affidavit, none of which have merit. First, Archuleta complains that "[t]here was no recitation" in the affidavit "of underlying circumstances from which [Detective Lane could have] concluded that the [anonymous] informants were credible." Aplt. Br. at 15. Importantly, however, that is not an essential requirement of a supporting affidavit. As noted by the district court, the Supreme Court's old Aguilar-Spinelli test required that, when an affidavit relied upon information from a confidential informant in order to establish probable cause, the issuing magistrate be informed of (1) the underlying circumstances from which the informant concluded the facts s/he related, and (2) the underlying circumstances that led the affiant to believe that the informant was credible. Spinelli v. United States, 393 U.S. 410 (1969); Aguilar v. Texas, 378 U.S. 108 (1964). But that test was abandoned by the Supreme Court nearly twenty-five years ago in favor of a "totality of the circumstances" test. Gates, 462 U.S. at 238. To be sure, "an informant's 'veracity,' 'reliability' and 'basis of knowledge' . . . all [remain] highly relevant in determining the value of his [or her] report." Id. at 230. However, the Supreme Court has concluded "that these elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case . . . ." Id.

Considering the "totality of the circumstances" outlined in Detective Lane's

affidavit, we conclude that the informants' tips all corroborated each other (since they all identified Archuleta, either by his given name or his street name, as the shooter), and that the key confidential informant had a history of providing reliable information to Officer O'Donnell. Thus, the lack of information indicating how the informants derived their information is not fatal to a finding of probable cause.

Archuleta next complains that the named witnesses referred to in the affidavit had no information that anyone resembling him actually participated in the shooting. It is true that the two named witnesses who were at Brookside Park at the time of the shooting (Marcela Tarwater and Aida Loya) did not report observing the shooter. They did, however, report observing a vehicle similar to that driven by Archuleta in the vicinity of the park immediately prior to the shooting, and also reported that the driver of that car had physical characteristics that Detective Lane concluded matched those of Archuleta. Under the "totality of the circumstances" test, these observations, combined with the other information gathered by the police, were more than sufficient to provide probable cause for the search warrant.

Archuleta also complains that the booking photo that was allegedly relied upon by Detective Lane in preparing his affidavit was never provided to the district court by the government, and that the district court erroneously relied on a different booking photo that was taken of Archuleta after the search of his residence had been completed and he had been arrested in connection with the Brookside shooting. Notably, Archuleta does not seriously challenge Detective Lane's observation that the physical characteristics

displayed in the booking photo of Archuleta "match[ed] those given by the witnesses who saw the driver of the black Cougar at Brookside Park." Nor does he assert that the physical characteristics that were displayed in the booking photo considered by the district court in this case would have been significantly different from those displayed in the booking photo actually observed by Detective Lane in preparing his affidavit. To be sure, we agree with Archuleta that the district court should not have taken into account the post-search booking photo in making its probable cause determination. However, its error in doing so has no bearing on our de novo review of whether Detective Lane's affidavit provided probable cause for the issuance of the search warrant.

Finally, Archuleta points to alleged flaws in Detective Lane's affidavit: (1) that Detective Lane did not "report the location of the black car when the shooting[] took place," Aplt. Br. at 16; (2) that his "4-year-old Cougar would not be considered an 'older' car," and "it was metallic blue, not black," id.; (3) "[t]here [wa]s no information about how far the witnesses were from the Cougar or how they were able to see the driver in the dark," id.; and (4) "[n]o explanation was offered for [Ms. Reyes'] surmise that the hecklers [at the hospital] were the shooters." Id. at 17. We conclude, considering the totality of the circumstances outlined in the affidavit, that these alleged flaws were immaterial.

*c) Conclusion*

In sum, we conclude the district court did not err in refusing to conduct an evidentiary hearing on Archuleta's motion. At best, Archuleta established the existence

of only one false statement in Detective Lane's affidavit, but did not establish that Detective Lane knowingly and intentionally, or with reckless disregard, employed that false statement. And, even omitting that false statement and replacing it with information suggested by Archuleta, the affidavit still provides probable cause for the issuance of the search warrant.[1]

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

---

[1] Having reached these conclusions, we find it unnecessary to address Archuleta's contentions that (1) Detective Lane's affidavit, on its face, failed to establish probable cause for the issuance of the search warrant, and (2) the good-faith exception outlined by the Supreme Court in United States v. Leon, 468 U.S. 897 (1984), does not apply here.